**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

PETER A. SCOTT, SR.,

                              Plaintiff,

        v.                                              No. 12-CV-20
                                                            (LEK/CFH)

WOODWORTH, Parole Officer,
Broome County, Division of Parole,

                              Defendant.[1]

_____

**APPEARANCES:**                          **OF COUNSEL:**

PETER A. SCOTT, SR.
Plaintiff Pro Se
98-B-0124
Green Haven Correctional Facility
P.O. Box 4000
Stormville, New York 12582


HON. ERIC T. SCHNEIDERMAN          ADELE M. TAYLOR-SCOTT, ESQ.
Attorney General for the                  Assistant Attorney General
   State of New York
Attorney for Defendant
The Capitol
Albany, New York 12224-0341


**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[2]

        Plaintiff pro se Peter A. Scott, Jr. ("Scott"), an inmate currently in the custody of the

_____

        [1]  By Decision and Order dated May 14, 2012, defendants Hoyt, Jackson, Taylor,
and the Commissioner of the New York State Division of Parole were dismissed without
prejudice from this action.  Dkt. No. 7 at 10.

        [2]  This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

New York State Department of Correctional and Community Supervision ("DOCCS"), brings

this action pursuant to 42 U.S.C. § 1983 alleging that defendant Woodworth, a parole

officer for the New York State Division of Parole ("NYSDOP"), violated his constitutional

rights under the Fourth, Eighth, and Fourteenth Amendments.  Compl. (Dkt. No. 1).

Presently pending is Woodworth's motion for summary judgment pursuant to Fed. R. Civ. P.

56.  Dkt. No. 25.  Scott does not oppose this motion.  For the reasons that follow, it is

recommended that Woodworth's motion be granted.


## I.  Failure to Respond

Scott did not oppose Woodworth's motion although the Court notified him of his

response deadline.  Dkt. No. 26.  "Summary judgment should not be entered by default

against a pro se plaintiff who has not been given any notice that failure to respond will be

deemed a default."  Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996).  Woodworth

provided notice in his motion papers as required by the Second Circuit and as normally

done by the office of Woodworth's counsel.  Id.; Dkt. No. 25-1.  Further, upon Scott's

motion for an extension to respond to Woodworth's motion, the Court granted Scott a sixty-

day extension.  Text Order dated 3/8/2013.  Despite the notices and extension, Scott failed

to respond.

"The fact that there has been no response to a summary judgment motion does not . . .

mean that the motion is to be granted automatically."  Champion, 76 F.3d at 486.  Even in

the absence of a response, defendants are entitled to judgment only if the material facts

demonstrate their entitlement to judgment as a matter of law.  Id.; FED. R. CIV. P. 56(c).  "A

verified complaint is to be treated as an affidavit . . . and therefore will be considered in

determining whether material issues of fact exist . . . ." Colon v. Coughlin, 58 F.3d 865, 872

(2d Cir. 1995) (citations omitted); see also Patterson v. Cnty. of Oneida, 375 F.3d 206, 219

(2d Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied

upon to oppose summary judgment."). The facts set forth in Woodworth's Rule 7.1

Statement of Material Facts (Dkt. No. 25-2) [hereinafter "Def.'s Statement"] are accepted as

true as to those facts that are not disputed in Scott's complaint. N.D.N.Y.L.R. 7.1(a)(3)

("The Court shall deem admitted any properly supported facts set forth in the Statement of

Facts that the opposing party does not specifically controvert.") (emphasis in original).


## II. Background[3]

On November 12, 1997, Scott pled guilty to two counts of sodomy in the second degree

in Broome County Court. Def.'s Statement ¶ 3; Woodworth Decl. (Dkt. No. 25-3) ¶ 4;[4] Dkt.

No. 25-3 at 5. Scott is serving an indeterminate sentence of seven to fourteen years.

Def.'s Statement ¶ 3; Woodworth Decl. ¶ 4; Dkt. No. 25-3 at 5. On December 23, 2009,

Scott was released on parole supervision to Dixie 2000, a residence program, and placed

under NYSDOP's jurisdiction until his maximum expiration date of June 6, 2014. Def.'s

Statement ¶ 4; Woodworth Decl. ¶¶ 5–7; Dkt. No. 25-3 at 7. Scott was released on both

standard and special conditions of release. Def.'s Statement ¶ 5; Woodworth Decl. ¶ 8;

Dkt. No. 25-3 at 7–8, 14–18. Scott signed a Certificate of Release to Parole acknowledging

---

[3] The majority of facts in this case is provided by Woodworth for Scott's allegations are contained in only two pages of a bare-bones complaint. See Compl. at 5–6.

[4] Paragraphs eleven through thirty-three of Woodworth's declaration were not submitted to the Court. See Woodworth Decl. at 2–3.

these conditions of release.  Def.'s Statement ¶ 6; Woodworth Decl. ¶ 8; Dkt. No. 25-3 at

7–8, 14–18, 53.

Scott agreed to the following standard conditions of release:

> (4) . . . permit my Parole Officer to visit me at my residence . . .
> and . . . permit the search and inspection of my person,
> residence and property."
>
> . . .
>
> (5) . . . reply promptly, fully and truthfully to any inquiry of or
> communication by my Parole Officer or other representative of
> the Division of Parole."
>
> . . .
>
> (7) . . . not be in the company of or fraternize with any person I
> know to have a criminal record . . . except for accidental
> encounters in public places . . . ."

Def.'s Statement ¶¶ 7–9; Dkt. No. 25-3 at 7.  Scott agreed to the following special

conditions of release:

> (13C) . . . make weekly office reports to my Parole Officer on
> every Thursday of every week until I am directed to the contrary.
>
> . . .
>
> (13L) . . . have no contact whatsoever with any male or female
> child who is 18 years of age or younger.  I understand that I will
> not have any conversation with any child, correspond with any
> child or be in the company of any child.  I understand that I will
> avoid those places where children get together including, but not
> limited to parks, schools, church groups, playgrounds, etc.  I
> further understand that I will not come within one thousand
> (1,000) feet of [such locations].
>
> . . .
>
> (13O) . . . will not own, purchase or possess any children's toys
> including, but not limited to children's videos, children's DVDs,
> children's computer games, children's clothing, etc.

4

. . .

> (13AA) . . . keep a daily journal of all my activities . . . and
> present this to my Parole Officer on my assigned report day.

Def.'s Statement ¶¶ 10–11; Dkt. No. 25-3 at 14–15, 17.

Woodworth served as Scott's parole officer. Def.'s Statement ¶ 2; Woodworth Decl. ¶¶ 2–3. Woodworth met with Scott in the morning of December 23, 2009 to discuss Scott's curfew and fees, review the conditions of release, complete drug testing, and take Scott's photograph. Woodworth Decl. ¶ 9.

On December 31, 2009, Scott made an office report[5] and requested permission to speak with his wife. Def.'s Statement ¶ 12; Woodworth Decl. ¶ 10; Dkt. No. 25-3 at 26. Scott reported to Woodworth that he does not have a history of domestic violence with his wife. Def.'s Statement ¶ 13; Woodworth Decl. ¶ 10; Dkt. No. 25-3 at 26. Woodworth decided to provisionally approve the requested contact. Woodworth Decl. ¶ 10; Dkt. No. 25-3 at 26. On January 7, 2010, Woodworth directed Scott to have only telephone contact with his wife until NYSDOP approves contact. Def.'s Statement ¶ 14; Dkt. No. 25-3 at 26.

On January 8, 2010, Woodworth and non-party Hoyt, also a parole officer, interviewed Scott's wife. Dkt. No. 25-3. Ms. Scott reported that she and Scott had a domestic altercation early on in their relationship. Def.'s Statement ¶ 16; Dkt. No. 25-3 at 26. Specifically, Scott struck Ms. Scott's face with his fist. Def.'s Statement ¶ 16; Dkt. No. 25-3 at 26. Ms. Scott indicated that Scott was visiting her at her residence, denied having any sexual contact with Scott, and revealed they went to the public library where Scott made an

---

[5] Standard Condition No. 2 for Scott was to "make office and/or written reports as directed." Dkt. No. 25-3 at 7.

unsuccessful attempt to obtain a library card.  Def.'s Statement ¶ 17; Dkt. No. 25-3 at 25.

Woodworth considered the public library to be a place where Scott would likely come into

contact with children under eighteen-years-old.  Def.'s Statement ¶ 18.

Later that day, Woodworth confronted Scott with the new information, to which Scott

conceded that he was dishonest about not having any domestic violence issues with his

wife.  Dkt. No. 25-3 at 25.  Woodworth searched Scott's person and found a condom and a

letter dated January 2010 from an incarcerated individual.  Def.'s Statement ¶ 19; Dkt. No.

25-3 at 25, 58, 63.  Scott then admitted to recording inaccurate information in his journal

and not bringing it to the office report.  Def.'s Statement ¶ 20; Dkt. No. 25-3 at 25.

Woodworth and Scott went to Scott's residence to retrieve the journal.  Def.'s

Statement ¶ 22; Dkt. No. 25-3 at 24.  At Scott's residence, Woodworth recovered Scott's

journal, which indicated that Scott had failed to update it since December 29, 2010.  Def.'s

Statement ¶ 23; Dkt. No. 25-3 at 24.  Woodworth also recovered a "Sponge Bob" television

set and remote control, two DVDs, and a "Family Guy" cartoon book.  Def.'s Statement

¶ 24; Dkt. No. 25-3 at 24.  Woodworth attested that his examination of Scott's residence

during home visits and search of Scott's coat during an office report were proper and

agreed to by Scott under Standard Condition No. 4 of his conditions of release.  Woodworth

Decl. ¶ 37.

After this search, Woodworth obtained a parole violation warrant for Scott's arrest.

Def.'s Statement ¶ 25; Woodworth Decl. ¶ 36.  Scott was taken into custody under the

warrant.  Def.'s Statement ¶ 26.  It was determined that a parole violation warrant should be

issued against Scott for the following reasons:  (1) failing to keep an accurate journal of his

activities and possess his journal during an office report; (2) failing to reply truthfully to

Woodworth's inquiries; (3) communicating with an individual he knew to have a criminal record; (4) threatening the community's safety and well-being by not keeping an accurate account of his activities; (5) visiting his wife, which was prohibited by Woodworth's verbal directive; (6) and visiting the library, which is a place frequented by children under eighteen-years-old. Def.'s Statement ¶ 21; Dkt. No. 25-3 at 60.

On January 11, 2010, Woodworth served Scott with a Notice of Violation. Def.'s Statement ¶ 27; Woodworth Decl. ¶ 36; Dkt. No. 25-3 at 33. A preliminary hearing was scheduled for January 14, 2010, which Scott waived. Def.'s Statement ¶¶ 28–29; Dkt. No. 25-3 at 26, 60.

On January 27, 2010, the final parole revocation hearing was held. Def.'s Statement ¶ 30; Dkt. No. 25-3 at 26. At the hearing, Scott pled guilty to having "violated rule 13AA of the conditions governing [his] release to parole supervision in that on or around January 8th, 2010 during an office report [he] failed to possess [his] journal as directed." Def.'s Statement ¶ 31; Dkt. No. 25-3 at 66–70. The remaining charges were dismissed. Def.'s Statement ¶ 31; Dkt. No. 25-3 at 70. In accordance with Scott's plea, Administrative Law Judge ("ALJ") Stanton recommended that the Parole Board impose an eighteen-month assessment period on Scott. Def.'s Statement ¶ 32; Woodworth Decl. ¶ 34.

## III.  Discussion

In his complaint, though inartfully pled, Scott contends that Woodworth violated: (1) his Fourth Amendment right to privacy by searching his dwelling without probable cause or consent; (2) the exclusionary rule of the Fourth Amendment by using evidence obtained from the search at the parole revocation hearing, including Ms. Scott's statements; (3) his

Eighth Amendment right against cruel and unusual punishment; (4) his Fourteenth Amendment due process rights by revoking his parole without warrant or notice; and (5) his Fourteenth Amendment equal protection rights by displaying discriminatory animus against him in order to effect his parole revocation.  Compl. at 5–6.  Scott also alleged that Woodworth conspired with Hoyt to deprive him of his equal protection rights.  Id. at 6.

Woodworth contends that Scott's complaint should be dismissed because: (1) the Eleventh Amendment bars the action as asserted against Woodworth in his official capacity; (2) there are no material issues of fact regarding Scott's privacy claims; (3) neither the exclusionary rule nor marital privileges apply to Scott's parole revocation hearing; (4) Scott's Eighth Amendment claim is conclusory and unsubstantiated; (5) Scott's Fourteenth Amendment claims are conclusory and unsubstantiated; (6) Scott's conspiracy claim is implausible; (7) he is entitled to qualified immunity; and (8) Heck v. Humphrey bars Scott's challenge to the revocation of his parole.  Def.'s Mem. of Law (Dkt. No. 25-4) at 2–3.

### A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law.  The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the

8

non-moving party.  <u>Skubel v. Fuoroli</u>, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial.  The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1223–24 (2d Cir. 1994); <u>Graham v. Lewinski</u>, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  <u>See</u> <u>Triestman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . .  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

<u>Id.</u> (citations and footnote omitted); <u>see</u> <u>also</u> <u>Sealed Plaintiff v. Sealed Defendant #1</u>, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds <u>pro se</u>, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion;

9

the requirement is that there be no genuine issue of material fact.  <u>Anderson</u>, 477 U.S. at 247–48.

## B. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State."  <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 98 (1984) (citing <u>Hans v. Louisiana</u>, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment.  <u>Halderman</u>, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states.  <u>See</u> <u>Quern v. Jordan</u>, 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official.  <u>Farid v. Smith</u>, 850 F.2d 917, 921 (2d Cir. 1988) (citing <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974)).  "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer.  <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Here, drawing all reasonable inferences in favor of Scott, Scott seeks monetary damages

10

against Woodworth for acts occurring within the scope of his duties with the NYSDOP.[6]

Thus, the Eleventh Amendment bar applies and serves to prohibit Scott's claims for

monetary damages against Woodworth's in his official capacity.

Accordingly, Woodworth's motion on this claim should be granted.


## C.  Search and Seizure

The Fourth Amendment protects the rights of individuals "to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S.

CONST. amend. IV.  Searches and seizures may be conducted if there exists probable

cause to believe that a crime has been committed and that evidence of that crime is present

on the person or premises to be searched.  Id.

Scott's status as a parolee afforded him a diminished expectation of privacy.  Samson

v. California, 547 U.S. 843, 852 (2006) ("[P]arolees . . . have severely diminished

expectations of privacy by virtue of their status alone.").  Such expectations of privacy are

even further diminished when a parolee, as a condition of release, has expressly consented

to having his parole officer search his residence.  United States v. Massey, 461 F.3d 177,

179 (2d Cir. 2006) ("A parolee's reasonable expectations of privacy are less than those of

ordinary citizens, and are even less so where, as here, the parolee, as a condition of being

released from prison, has expressly consented to having his residence searched by his

parole officer.") (internal quotation marks and citations omitted); United States v. Pabon,

603 F. Supp. 2d 406, 415 (N.D.N.Y. 2009) (same).  "Conversely, the state has a legitimate

---

[6]  Scott only expressly requests for "[a]n order directing that [Woodworth] violated
the United States Constitution."  Compl. at 7.

interest in closely monitoring the activities of its parolees . . . ." <u>Massey</u>, 461 F.3d at 179 (citation omitted); <u>People v. Huntley</u>, 43 N.Y.2d 175, 183 (1977) (interpreting New York parole agreements to require that parole officers conduct searches that are "rationally and substantially related to the performance of [their] duty").

Scott's claim that Woodworth, without consent, unreasonably searched and seized evidence from his residence is without merit.  Generally, unless an exception is applicable, the absence of a warrant issued upon probable cause for conducting a search is "per se unreasonable."  <u>Pabon</u>, 603 F. Supp. 2d at 412 (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973)).  Consent to a warrantless search is an example of a recognized exception.  <u>Id.</u> (citation omitted).  Pursuant to state regulations, Scott had previously consented to have his residence searched[7] and was released to Dixie 2000 that is listed as his residence.  Therefore, since the record clearly reflects that Scott expressly consented to have his person, residence, and property be searched in his standard conditions of release, Scott has failed to establish the presence of a genuine issue of material fact with respect to his consent argument.  <u>Celotex Corp.</u>, 477 U.S. at 323.

Despite Scott's consent to the search, Woodworth has established that he had reasonable grounds to search Scott's residence.  <u>United States v. Knights</u>, 534 U.S. 112, 121 (2001) (holding that no more than reasonable suspicion is required to search a

---

[7]  Pursuant to state law, Scott "is subject to warrantless and suspicionless searches because he has submitted to this condition in accordance with New York State Parole Regulations."  <u>Pabon</u>, 603 F. Supp. 2d. at 415 n.2 (<u>citing</u> N.Y. COMP. CODES R. & REGS. tit. 9, § 8003.2(d)); <u>see</u> Standard Condition No. 4.

probationer's residence when the probationer is subjected to a search condition).[8]  First, Woodworth learned that Scott was dishonest about the absence of a domestic violence history with Ms. Scott.  Standard Condition No. 5 <u>supra</u>.  Second, in contravention of Woodworth's verbal directive, Scott had in-person contact with Ms. Scott.  Third, Scott visited a public library, a place where children under the age of eighteen are likely to congregate.  Special Condition No. 13L <u>supra</u>.  Fourth, Scott failed to bring his journal to an office report.  Special Condition No. 13AA <u>supra</u>.  The aggregation of these grounds sufficiently established reasonable suspicion to search Scott's residence.  <u>Knights</u>, 534 U.S. at 121; <u>Pabon</u>, 603 F. Supp. 2d at 415.  Such reasonable suspicion, in conjunction with Scott's consent to the search and inspection of his person, residence, and property as part of his standard conditions of release, shows that Woodworth has demonstrated the absence of a material fact with respect to Scott's search and seizure claim against him. <u>Celotex Corp.</u>, 477 U.S. at 323.

Accordingly, Woodworth's motion on this claim should be granted.

## 2. Exclusionary Rule and Martial Privileges[9]

Scott contends that the exclusionary rule of the Fourth Amendment bars the

---

[8]  Scott alleged that Woodworth searched his residence without probable cause. Compl. at 5.  Under <u>United States v. Knights</u>, it follows that given Scott's agreement to a search condition, Woodworth did not require probable cause, but only reasonable suspicion, to lawfully search Scott's residence.  534 U.S. at 121.

[9]  Woodworth also asserts that any claims based on the exclusionary rule are barred by the lack of his personal involvement in the ultimate decision to revoke Scott's parole.  Def.'s Mem. of Law at 14.  However, because it is recommended herein that Woodworth's motion as to the exclusionary rule claim be granted on other grounds, his motion based on the lack of his personal involvement need not be addressed.

introduction of any evidence obtained through the search of his residence.  "[T]he governments' use of evidence obtained in violation of the Fourth Amendment does not itself violate the Constitution."  Pa. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 362 (1998) (citing cases).  "[T]he exclusionary rule . . . generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights."  Id. at 359.  It is a judicial remedy intended to deter unlawful searches and seizures, "applicable only where its deterrence benefits outweigh its substantial social costs."  Id. at 363 (internal quotation marks and citations omitted).  It is well-settled that the exclusionary rule does not apply to parole revocation hearings.  Id. at 369 (holding "parole boards are not required by federal law to exclude evidence obtained in violation of the Fourth Amendment").  Here, even assuming the search of Scott's residence was unreasonable, the exclusionary rule cannot preclude the introduction of evidence obtained through the search because the rule is inapplicable to Scott's parole revocation hearings.  Scott, 524 U.S. at 362.  Thus, Scott's attempt to invoke the exclusionary rule is misplaced and must be dismissed.

Further, Scott's contention that marital privileges preclude his wife's statements from entering into evidence at his parole revocation hearings is also without merit.  At common law, there are two marital testimonial privileges available to preclude certain statements from entering into evidence.  United States v. Premises Known as 281 Syosset Woodbury Road, 71 F.3d 1067, 1070 (2d Cir. 1995); In re Witness Before Grand Jury, 791 F.2d 234, 236 (2d Cir. 1986).  The first is an "adverse spousal testimony privilege," which allows an individual to refuse to testify against his or her spouse during the course of a criminal proceeding.  281 Syosset Woodbury Road, 71 F.3d at 1070.  This privilege is available when one spouse is a party to a proceeding and the other spouse is called to testify.  Id.

14

Only the witness spouse can invoke this privilege to refuse to testify.  Trammel v. United States, 445 U.S. 40, 44 (1980).  The second is the "confidential marital communications privilege."  281 Syosset Woodbury Road, 71 F.3d at 1070.  It is a narrower privilege than the adverse spousal testimony privilege and either spouse can invoke it to prevent the introduction of certain communications.  Id.  "[T]his privilege applies only to communications made in confidence during a valid marriage."  In re Witness Before Grand Jury, 791 F.2d at 238.

In this case, "formal procedures and rules of evidence are not required" at a parole revocation hearing.  United States ex rel. Carrasquillo v. Thomas, 527 F. Supp. 1105, 1109 (S.D.N.Y. 1981), aff'd, 677 F.2d 225 (2d Cir. 1982) (citing Gagnon v. Scarpelli, 411 U.S. 778, 789 (1973)).  Thus, it appears that Scott is not entitled to invoke marital privileges at his parole revocation hearings.  Even assuming Scott is entitled to invoke such privileges, Scott is unable to show that either privilege is applicable in his case.

Turning first to the adverse spousal testimony privilege, it is inapplicable because a parole revocation hearing is not a criminal proceeding.  Carrasquillo, 527 F. Supp. at 1109 ("The Supreme Court has emphasized that revocation of parole is not part of a criminal prosecution but is an administrative procedure that may result in depriving a parolee of his conditional liberty for failure to observe special parole conditions." (citing Morrissey, 408 U.S. at 480)).  Further, only Ms. Scott is empowered to invoke the privilege and refuse to testify.  Trammel, 445 U.S. at 44.

As for the confidential marital communications privilege, it is unavailable to Scott because the evidence sought to be suppressed "does not involve marital 'communications,' that is, utterances or expressions intended to convey information between spouses."

15

Witness Before Grand Jury, 791 F.2d at 239 (citing Pereira v. United States, 347 U.S. 1, 6 (1954)).  "Testimony concerning a spouse's conduct can be precluded upon the spouse's challenge only in the rare instances where the conduct was intended to convey a confidential message from the actor to the observer."  United States v. Estes, 793 F.2d 465, 467 (2d Cir. 1986).  Here, Ms. Scott voluntarily advised Woodworth about Scott's domestic violence history, in-person contact with her, and a visit to the public library.  Such inquiries go to "actions that are not communicative and that may be described without divulgences of privileged communications . . . [and] are not barred by the privilege."  Witness Before Grand Jury, 791 F.2d at 239 (citing cases).  Moreover, such actions do not fit into the category of rare instances where the conduct was intended to convey a confidential message to Ms. Scott.  Estes, 793 F.2d at 467 (concluding that counting, hiding, and laundering money did not convey confidential messages to the observer); Witness Before Grand Jury, 791 F.2d at 239 (concluding questions concerning bank accounts, credit cards, car registration, and the like are not considered confidential by the federal courts).

Accordingly, Woodworth's motion on these claims should be granted.


### D.  Eighth Amendment

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983.  Hudson v. McMillian, 503 U.S. 1, 9–10 (1992).  The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain."  Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000).  To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective

16

elements.  <u>Blyden v. Mancusi</u>, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." <u>Hudson</u>, 503 U.S. at 9 (internal citations omitted); <u>Blyden</u>, 186 F.3d at 262.  However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation <u>per se</u>" regardless of the seriousness of the injuries.  <u>Blyden</u>, 186 F.3d at 263 (citing <u>Hudson</u>, 503 U.S. at 9).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition <u>de minimis</u> uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Hudson</u>, 503 U.S. at 9–10 (citations omitted).  "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" <u>Sims</u>, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." <u>Sims</u>, 230 F.3d at 21 (citation omitted).  The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" <u>Id.</u> (quoting <u>Hudson</u>, 503 U.S. at 7).  In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider:  "the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." <u>Scott v. Coughlin</u>, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

17

In this case, Scott's Eighth Amendment claim against Woodworth should be dismissed for several reasons. First, Scott makes only a conclusory statement that Woodworth "violated the 8th . . . cruel and unusual . . . " without further allegations or support.[10] Compl. at 6. Second, while viewing the facts in the light most favorable to the plaintiff, Scott may have attempted to allege that his re-incarceration constituted cruel and unusual punishment, Scott proffers nothing in his complaint nor the record to support either the objective or subjective prong of the Eighth Amendment analysis. Blyden, 186 F.3d at 262. Moreover, "[i]ncarceration does not constitute cruel and unusual punishment. Rather, after incarceration, only the 'unnecessary and wanton infliction of pain,' constitutes cruel and unusual punishment." Gill v. Stella, 845 F. Supp. 94, 102 (E.D.N.Y. 1994) (quoting Ingraham v. Wright, 460 U.S. 651, 670 (1977)). Scott does not allege that Woodworth was in any way involved with the use of excessive force during his re-incarceration. As such, a reasonable factfinder would not be able to find in favor of Scott. Gallo, 22 F.3d at 1223–24.

_____

[10] Woodworth brings to the Court's attention that Scott had attempted to allege a potential Fourth Amendment excessive force claim against him. Def.'s Mem. of Law at 17–18. The Fourth Amendment prohibits a law enforcement officer from using excessive force during the course of effecting an arrest. Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). However, in making an arrest, a law enforcement officer "necessarily carries . . . the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396 (citing Terry v. Ohio, 392 U.S. 1, 22–27 (1968)). In determining whether an officer used excessive force in executing an arrest, the Court examines whether the force used is objectively unreasonable "in light of the facts and circumstances confronting [the officer], without regard to the officer['s] underlying intent or motivation." Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006) (quoting Graham, 490 U.S. at 397).

Here, as previously discussed, Scott makes nothing more than a conclusory allegation involving cruel and unusual punishment against Woodworth. Scott does not provide the Court with any facts or evidence going to the actual force used against him during his arrest or how that force was beyond reasonable under the circumstances of the arrest. Thus, to the extent that Scott's allegations could be seen as a potential Fourth Amendment excessive claim, such a claim should be dismissed from this action.

Woodworth has established the absence of a material fact with regards to the Eighth Amendment claim against him. Celotex Corp., 477 U.S. at 323.

Accordingly, Woodworth's motion on this claim should be granted.


### E.  Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1.  It is important to emphasize that due process "does not protect against all deprivations of liberty.  It protects only against deprivations of liberty accomplished without due process of the law." Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted).  "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted).


### 1.  Procedural Due Process

A final parole revocation proceeding is an administrative proceeding held solely to enable parole authorities to determine whether the parolee violated the terms of parole. People ex rel. Maiello v. New York State Bd. of Parole, 65 N.Y.2d 145, 147 (1985). Although a parolee facing revocation of release is not entitled to the "full panoply of rights" due a defendant in a criminal prosecution, the Supreme Court has held that the revocation of parole implicates a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. Morrissey v. Brewer, 408 U.S. 471, 482 (1972).  Upholding the Morrissey decision, a year later the Supreme Court further defined the process required

19

during a preliminary parole revocation hearing.  <u>Gagnon v. Scarpelli</u>, 411 U.S. 778, 786

(1973).  "At the preliminary hearing, a probationer or parolee is entitled to notice of the

alleged violations of probation or parole, an opportunity to appear and to present evidence

in his own behalf, a conditional right to confront adverse witnesses, an independent

decisionmaker, and a written report of the hearing."  <u>Id.</u> (citing <u>Morrissey</u>, 408 U.S. at 487).

Furthermore, at the final hearing, individuals are given a more detailed hearing with the

minimum requirements including:

> (a) written notice of the claimed violations of (probation or) parole;
> (b) disclosure to the (probationer or) parolee of evidence against
> him; (c) opportunity to be heard in person and to present witnesses
> and documentary evidence; (d) the right to confront and
> cross-examine adverse witnesses (unless the hearing officer
> specifically finds good cause for not allowing confrontation); (e) a
> 'neutral and detached' hearing body such as a traditional parole
> board, members of which need not be judicial officers or lawyers;
> and (f) a written statement by the factfinders as to the evidence
> relied on and reasons for revoking (probation or) parole.

<u>Id.</u> (citing <u>Morrissey</u>, 408 U.S. at 489) (internal quotation marks omitted).  "New York

provides procedures for parole revocation that generally satisfies due process."  <u>Calhoun v.

New York State Div. of Parole Officers</u>, 999 F.2d 647, 652 (2d Cir. 1993) (citing N.Y. Exec.

Law § 259-i(3)(f)).

   Here, Scott alleged that Woodworth revoked his parole without providing timely notice

or a warrant.  Scott does not specify whether these allegations are directed at the

preliminary hearing or the final revocation hearing.  Assuming Scott directs those

allegations toward the preliminary hearing, the record demonstrates that Scott received the

process to which he was entitled.  A warrant was served on Scott on January 8, 2010.

Woodworth served a notice of violation on January 11, 2010, within three days after the

20

warrant was executed, pursuant to N.Y. Executive Law § 259-1(c)(3)(iii).  The preliminary

hearing was scheduled for January 14, 2010.  Thus, Scott was provided with warrant and

notice of the alleged parole violations prior to the preliminary hearing taking place.  Further,

Scott waived his preliminary hearing.  He does not challenge the validity of his waiver nor

does the record indicate otherwise.  <u>Alvarado v. City of New York</u>, 482 F. Supp. 2d 332, 338

(S.D.N.Y. 2007) ("Under New York law, the waiver of a preliminary hearing must be

'knowingly, intelligently, and voluntarily." (citation omitted)).  Scott cannot now claim that he

was denied due process when he voluntarily refused to carry out such process.  Therefore,

Scott has been provided all the process that he was due for his preliminary hearing.

Assuming Scott directs his allegations toward his final revocation hearing, Scott has

also received all the process that he was due.  Those allegations are negated by the record

and Scott's knowing and voluntary guilty plea in the presence of his attorney.  <u>See generally</u>

<u>Tollett v. Henderson</u>, 411 U.S. 258, 267 (1973) (concluding that "a guilty plea represents a

break in the chain of events which has preceded it . . . .," therefore, when a guilty plea is

rendered, the defendant, "may not thereafter raise independent claims relating to the

deprivation of constitutional rights that occurred prior to the entry of the guilty plea.  He may

only attack the voluntary and intelligent character of the guilty plea . . . ."); <u>United States v.</u>

<u>Coffin</u>, 76 F.3d 494, 498 (2d Cir. 1996) (same).  Scott has not made any contentions

against the knowing and voluntariness of his plea.

Moreover, the dialogue between the ALJ, Scott, and Scott's counsel would refute any

claims that Scott's plea was made under misinformation, duress, or coercion.  Specifically,

the judge discussed, in Scott's presence, with Scott's counsel that counsel had explained to

Scott his rights and available pleas prior to accepting his guilty plea.  Dkt. No. 25-3 at

66–70.  Accordingly, any contentions that Scott may have proffered that he failed to understand the consequences of his parole revocation proceedings is belied by the record.

Lastly, Scott's due process claims run afoul of the "favorable termination" rule of Heck v. Humphrey, 512 U.S. 477, 487–87 (1994).  That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983. Courts have applied this rule to § 1983 actions challenging the procedures used in parole revocation hearings.  Bratton v. New York State Div. of Parole, No. 05-CV-950 (NAM/GJD), 2006 WL 2792743, at *2 (N.D.N.Y. 2006) (citing inter alia Dallas v. Goldberg, 143 F. Supp. 2d 312, 322 (S.D.N.Y. 2001) ("The Heck holding applies equally in the parole revocation context.")).[11]  There is no evidence that Scott's parole revocation decision was ever invalidated, vacated, overturned, or expunged.  Thus, the Heck rule still applies and any procedural challenges are barred.  Therefore, because Scott's recovery of damages here for faulty hearing procedures and his requested relief would necessarily imply the invalidity of his disciplinary convictions, the requested relief based on that hearing is barred.

Accordingly, Woodworth's motion on this claim should be granted.


## 2.  Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons

---

[11]  All unpublished opinions cited to by the Court in this Report-Recommendation are, unless otherwise noted, attached to this Recommendation.

be treated equally.  <u>City of Cleburne, Tex. v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439

(1985); <u>Phillips v. Girdich</u>, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the

Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than

others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective
> adverse treatment of individuals compared with other similarly
> situated individuals if such selective treatment was based on
> impermissible considerations such as race, religion, intent to inhibit
> or punish the exercise of constitutional rights, or malicious or bad
> faith intent to injure a person.

<u>Vegas v. Artus</u>, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and

citations omitted).  With respect to prisoners, in order to establish an equal protection

violation, the plaintiff must show that "the disparity in treatment cannot survive the

appropriate level of scrutiny which . . . means that he must demonstrate that his treatment

was not reasonably related to any legitimate penological interests."  <u>Phillips v. Girdich</u>, 408

F.3d 124, 129 (2d Cir. 2005).

If an individual cannot "allege membership in [a protected] class, he or she can still

prevail in . . . a class of one equal protection claim."  <u>Neilson v. D'Angelis</u>, 409 F.3d 100,

104 (2d Cir. 2005) (internal quotation marks and citations omitted).  To succeed, a plaintiff

must show "that [he] were intentionally treated differently from other similarly-situated

individuals without any rational basis."  <u>Clubside, Inc. v. Valentin</u>, 468 F.3d 144, 158–59 (2d

Cir. 2006).  Additionally, a plaintiff must establish an extremely high "level of similarity

between plaintiffs and the persons with whom they compare themselves . . . ."  <u>Neilson</u>, 409

F.3d at 104.

Liberally construing the facts in the light most favorable to the plaintiff, Scott contends

that parolees are not treated equally to non-incarcerated, ordinary citizens. "Parolees do not constitute a suspect or quasi-suspect class, requiring heightened scrutiny for purposes of equal protection analysis." Bratton v. New York State Div. of Parole, No. 05-CV-950, 2008 WL 1766744, at *11 (N.D.N.Y. 2008) (Dkt. No. 25-4) at 35 (citing City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). Rather, a parolee's status justifies the infringement of his Fourth Amendment rights. Id. (citation omitted). Therefore, Scott's equal protection claim pertaining to his parole revocation must fail since he "cannot make out a claim that he was similarly situated to ordinary citizens in respect to his Fourth Amendment rights." Id. To the extent Scott alleged his equal protection claim as a "class of one" claim, such a claim must also fail. This is so because, despite Scott's conclusory allegation of Woodworth displaying discriminatory animus against him, Scott makes no showing that Woodworth intentionally treated him differently from others similarly situated without any rational basis. Id. (citing Giordano v. City of New York, 274 F.3d 740, 751 (2d Cir. 2001)). As such, Scott's equal protection claim is meritless.

Accordingly, Woodworth's motion on this claim should be granted.


## F.  Conspiracy[12]

In order to support a claim for conspiracy under §§ 1983 or 1985, there must be "(1) an agreement . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. Cnty. of Nassau, 292

---

[12] Woodworth also asserts that any conspiracy claims are effectively barred by the intra-corporate conspiracy doctrine. However, because it is recommended herein that Woodworth's motion as to the conspiracy claim be granted on other grounds, his motion based on the intra-corporate conspiracy doctrine need not be addressed.

24

F.3d 307, 324–25 (2d Cir. 2002); Cusamano v. Sobek, 604 F. Supp. 2d 416, 468 (N.D.N.Y. 2009).  An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. See Iqbal v. Hasty, 490 F.3d 143,177 (2d Cir. 2007); see also Gyadu v. Hartford Ins. Co., 197 F.3d 590, 591 (2d Cir. 1999).  Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end."  Warren v. Fischl, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations omitted).  While exact specifics are not required, "the pleadings must present facts tending to show agreement and concerted action."  Anilao v. Spota, 774 F. Supp. 2d 457, 512–13 (E.D.N.Y. 2011) (citations omitted).  Conclusory, vague, and general allegations are insufficient to support a conspiracy claim.  Ciambriello, 292 F.3d at 325.

Here, Scott failed to provide evidence sufficient to support a viable conspiracy claim between Woodworth and Hoyt in their alleged denials of due process claims.  Scott's claims of conspiracy are solely conclusory.  Ciambriello, 292 F.3d at 325.  There is nothing in the record to establish that Woodworth and Hoyt had any type of agreement between them. There were no allegations outlining with specificity when, why, or how this alleged conspiracy occurred.  Warren, 33 F. Supp. 2d at 177.  Even though specifics are unnecessary, Scott fails to provide any plausible information which would lend credence to his claims of an explicit or implicit agreement between any or all of the unnamed DOCCS employees.  Anilao, 774 F. Supp. 2d at 512–13.

Accordingly, Woodworth's motion on this claim should be granted.

## G.  Qualified Immunity

Woodworth claims that even if Scott's constitutional claims are substantiated, he is nevertheless entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir. 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be addressed with respect to Scott's Fourth, Eighth, or Fourteenth Amendment claims because, as discussed supra, it has not been shown that Woodworth violated Scott's constitutional rights.

Accordingly, it is recommended that Woodworth's motion on this ground be granted.


## IV.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Woodworth's motion

26

for summary judgment (Dkt. No. 25) be **GRANTED** as to all claims and judgment be entered in Woodworth's favor and Scott's complaint (Dkt. No. 1) be **DISMISSED** with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  May 31, 2013
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge